DENNIS JACOBS, Chief Judge,
dissenting from the denial of rehearing in banc:
I concur in Judge Raggi’s and Judge Livingston’s scholarly dissents. I would also subscribe to Judge Koeltl’s opinion dismissing this case for lack of standing. I write separately to make a few points of my own.
The panel opinion repeatedly emphasizes that its impact is on the threshold standing issue only and that it has no bearing on the merits. See Amnesty Int’l USA v. Clapper, 638 F.3d 118, 121, 131, 143 n. 26, 145 (2d Cir.2011). I take the opinion on those terms. The panel opinion does indeed avoid the merits. The panel’s analysis of injury simply credits as sufficient certain averments by the plaintiffs that seem to me inadequate, implausible, and illusory. And the panel’s analysis of redressability, which ordinarily requires a preliminary merits review (to determine if the court could ameliorate some palpable harm to the plaintiffs), is consigned to an uninformative footnote. It is therefore quite so that the panel opinion decides nothing about the merits — and thereby leaves the way clear for dismissal after remand at a stage just beyond the threshold of standing.
*201 That said, I think that it is a defect in the panel opinion that it elides even the glancing review of the merits that is needed to determine if the challenged statute impairs the Fourth Amendment rights of these plaintiffs, or if they suffer an injury that a court can alleviate. That review, which I undertake here, refutes harm and redressability, and should therefore have defeated standing: These plaintiffs and their lawyers are claiming a policy-making role on matters that have no Fourth Amendment impact on them.
* * *
An assortment of lawyers, journalists and activists, and organizations representing such people, facially challenge the constitutionality of § 702 of the Foreign Intelligence Surveillance Act of 1978 (“FISA”), 50 U.S.C. § 1881a, which was added to FISA by § 101(a)(2) of the FISA Amendments Act of 2008 (the “FAA”).
Their claim is that the FAA lowers the standards for obtaining warrants to surveil foreign persons abroad, which has caused the plaintiffs, who are not foreigners, to develop a reasonable fear of being surveilled when communicating -with foreigners around the world who are their journalistic sources, clients, human rights victims, witnesses and so on — all of whom are, in plaintiffs’ estimation, potential objects of surveillance. The plaintiffs contend that this fear compels them to communicate with their clients or foreign contacts only in person, at such trouble and expense as to constitute injury that supports standing.
Three things are ordinarily required for constitutional standing: (1) injury in fact, (2) causality, and (3) redressability. If a plaintiff is not personally subject to the government action, the panel opinion identifies a fourth requirement: a “showing that [the plaintiff] has altered or ceased conduct as a reasonable response to the challenged statute.” Clapper, 638 F.3d at 141 (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 184-85, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). The plaintiffs show none of these.
To support the otherwise-mysterious idea of injury to these plaintiffs (and causation), the panel opinion relies entirely (even credulously) on affidavits submitted by the plaintiffs, describing their supposed anxieties. But these affidavits employ all the lawyer’s arts to convey a devious impression.
The panel opinion bases its finding of injury and causation entirely on the ethical duties of lawyers and the affidavits of the lawyer plaintiffs.[1] So evidence about the non-lawyer plaintiffs (to the extent there is any that specifies an injury) is irrelevant here. (For some reason, the panel’s mandate nevertheless confers standing indiscriminately on all the plaintiffs, including the journalists and various other activists.)
Among the plaintiffs who submitted affidavits, only two are lawyers who represent clients. Scott McKay, a lawyer for Guantanamo Bay detainees, does not specify a single trip he took or a single dollar he spent as a result of the FAA. Instead, he just avers generally that he “minimize[s] the amount of sensitive information that [he] communicate[s] by telephone or *202 email” and that “[w]henever possible, [he] also collects] information in person rather than by telephone or email.” Declaration of Scott McKay ¶ 8. Of course, that is what every good lawyer does — on every matter. Sylvia Royce, another lawyer representing a detainee, specifies only a single expense she attributes to the FAA: a trip to Manhattan (not Guantanamo). She avers:
Where information is both especially important and especially sensitive, I have to travel to share information, views and ideas that I would otherwise have been able to exchange by telephone or e-mail. Most recently, I went to New York City to meet with [a French attorney] and another lawyer to talk about [my client’s] case, but I also expect to travel abroad in the future to meet with co-counsel and I expect to exchange information in our meetings in person that I would not exchange by telephone or email.
Declaration of Sylvia Royce ¶ 7. Yet (as Judge Raggi points out) the FAA had nothing to do with her trip to New York to talk with co-counsel because a call between points inside the United States could not have been tapped under the FAA.
Even if one accepts the truth of these perfunctory affidavits (with their studied vagueness and anticipations of the conveniently unknown future), the declarations contained in them do not establish that either lawyer was injured or incurred expense that had any causal relation to the FAA. Yet, these affidavits provide the only evidence to support the panel’s ruling as to harm and causation.
The remaining standing issue, redressability, is consigned to a footnote in the panel opinion, a footnote that does not explain how a favorable decision in this case will redress plaintiffs’ supposed injuries. Clapper, 638 F.3d at 140 n. 24. Even if the record disclosed specific instances in which lawyers were injured by the FAA, plaintiffs would still lack standing for the reason identified by Judge Alice Batchelder in ACLU v. NSA, 493 F.3d 644 (6th Cir.2007), an opinion that is not answered head-on by the panel opinion. Any lawyer whose ethical scruples would now prevent electronic contact with his foreign clients out of fear of surveillance would have had to incur the same bother and expense before the FAA, since the FISA Court has already approved thousands of warrants. Id. at 670-72. Thus, the plaintiffs (and the panel opinion) prove too little.
By the same token, the plaintiffs (and the panel opinion) prove too much. The ethical obligation discussed by Prof. Gillers (see supra note 1) has nothing to do with whether the FAA is constitutional: what is “[d]eterminative of how the lawyer may proceed is,” as Prof. Gillers explains, “whether the lawyer has good reason to believe that his or her communications are reasonably likely to be intercepted, even if the interception is lawful.” See Clapper, 638 F.3d at 128 (quoting Gillers Decl. ¶ 11) (emphasis added). Thus, any burden imposed on plaintiffs by the risk of surveillance arose under the pre-FAA regime as well. And since (obviously) wiretap surveillance is authorized by statutes other than the FAA, it is by no means limited to foreigners abroad. So the inhibition that allegedly besets the plaintiffs would (if valid) affect all criminal defense lawyers- — -not to mention psychiatrists and the clergy— all the time.
The panel’s redressability argument (following plaintiffs’ affidavits) is also premised on the fanciful idea that, for a foreign person of interest abroad in his own country, the only risk of surveillance is surveillance by the United States — as though otherwise persons of interest in Iran, Syria, Bosnia, Sudan and Cuba (not to mention Russia or Spain) can chatter away confi *203 dent that the security services of those countries (and others) are not listening— as though those places have a Fourth Amendment to be begin with, and adhere to it more scrupulously than does the United States. The plaintiffs’ affidavits thus betray their buried assumption that the United States is the only threat to liberty that anyone anywhere needs to worry about.
Finally, the FAA does not even bear upon the plaintiffs’ Fourth Amendment rights because the FAA concerns only the surveillance of persons abroad who are not United States citizens or residents. The FAA implements this limitation through minimization (procedures for limiting the information received and retained by electronic surveillance) and targeting (procedures for limiting the persons and facilities to be surveilled), and the FISA Court is given power to review those procedures for compliance with the Fourth Amendment.[2] Since the FAA bars the targeting of individuals in or of the United States, there can be nothing for the FISA Court to consider under the Fourth Amendment but those procedures.
And as to persons abroad, with whom the plaintiffs claim to be in communication: “the Fourth Amendment has no application” to the search of a person of foreign nationality, outside the United States, with “no voluntary attachment” to this country. United States v. Verdugo-Urquidez, 494 U.S. 259, 274, 275, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990); see also In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 157, 171 (2d Cir.2008) (holding “that the Fourth Amendment’s Warrant Clause has no extraterritorial application” to searches of United States citizens abroad).
In short, the FAA does not implicate any Fourth Amendment right of any plaintiff, or of any foreign person with whom any plaintiff may communicate.
Since these plaintiffs are not subject to the FAA, and since the Fourth Amendment has no application to their supposed clients, sources and communicants — who are foreign persons abroad — and since the only evidence they proffer of personal inconvenience and expense are affidavits that are craftily worded to skirt actual falsehood, what is the interest in bringing this suit?
At the risk of being obvious, the purpose of this lawsuit is litigation for its own sake — for these lawyers to claim a role in policy-making for which they were not appointed or elected, for which they are not fitted by experience, and for which they are not accountable. As best I can see, the only purpose of this litigation is for counsel and plaintiffs to act out their fantasy of persecution, to validate their pretensions to policy expertise, to make themselves consequential rather than marginal, and to raise funds for self-sustaining litigation. In short, counsel’s and plaintiffs’ only perceptible interest is to carve out for themselves an influence over government policy — an interest that the law of standing forecloses.
For the foregoing reasons, I conclude that the plaintiffs suffered no injury, and certainly none that can be redressed by this Court. In part, that is a function of the frivolous nature of the claim. In that *204 respect, it bears similarity to a pro se plaintiffs allegation that the CIA is controlling him through a radio embedded in his molar. But, as to the standing analysis, there is this difference: The pro se plaintiff is actually suffering, is truly hoping for redress, and is not bringing suit as a pretext to weigh in on government policy-
PETER W. HALL, Circuit Judge, dissenting from the denial of rehearing in banc:
I respectfully dissent from the denial of rehearing in banc solely because I believe this ease “involves a question of exceptional importance” warranting in banc review. Fed. R.App. P. 35(a)(2).

. The lawyers among the plaintiffs invoke an affidavit of Prof. Stephen Gillers, which contains a sound review of the ethical duties of lawyers:
If an attorney has reason to believe that sensitive and confidential information related to the representation of a client and transmitted by telephone, fax, or e-mail is reasonably likely to be intercepted by others, he or she may not use that means of communication in exchanging or collecting the information. He or she must find a safer mode of communication, if one is available, which may require communication in person.
Declaration of Prof. Stephen Gillers ¶ 10.

. Under the FAA, a surveillance order shall issue:
If the Court finds that a certification submitted in accordance with subsection (g) contains all the required elements and that the targeting and minimization procedures adopted in accordance with subsections (d) [targeting] and (e) [minimization] are consistent with the requirements of those subsections and with the fourth amendment to the Constitution of the United States.
50 U.S.C. § 1881a(i)(3)(A) (emphasis added).